Barnabus Abel LANDRY, Donna Landry, Individually and on behalf of the minor child Kameron Joseph Landry, Plaintiffs,

v.

OCEANIC CONTRACTORS, INC., Insurance Company of North America, Tidex, Inc., Schramm, Inc., Tidex International, Pental Insurance Company, Ltd., American Home Assurance Company, Americas Insurance Company, Defendants.

OCEANIC CONTRACTORS, INC.
(McDermott International,
Inc.), Plaintiff,

v.

PENTAL INSURANCE COMPANY,
LTD., Defendant.

Civ. A. Nos. 79–4919, 81–23.

United States District Court,
E. D. Louisiana.

Aug. 2, 1982.

Vance E. Ellefson, New Orleans, La., for Oceanic Contractors, Inc. and Ins. Co. of North America.

Cliffe F. Laborde, Gerard T. Gelpi, New Orleans, La., for Tidex, Inc., Tidex Intern., Inc. and Pental Ins. Co.

Francis Emmett, New Orleans, La., for American Home Assur. Co.

CASSIBRY, District Judge:

The claim of the plaintiff for personal injury was settled during the trial of this case. The trial was thereafter limited to issues of liability between two defendant United States corporations, Oceanic Contractors, Inc., [Oceanic] and Tidex International, Inc., [Tidex], for the injuries of Barnabus A. Landry, an American seaman involved in the restoration of an oil production platform in the Arabian Gulf, and insurance coverage of Oceanic under a policy of marine insurance procured by Tidex.

On November 6, 1979, Barnabus A. Landry, a relief foreman aboard the D/B 14, a derrick barge operated by Oceanic, suffered a severe head injury while working aboard

the M/V BETH TIDE, while that vessel was located on the navigable waters of the Arabian Gulf, off the coast of Saudi Arabia. The BETH TIDE was owned by Tidewater Georgetown, Inc., a subsidiary of Tidewater, Inc., [not a party to this suit] and subject to a bareboat charter to Oceanic. At the time of Mr. Landry's injury, the vessel was being operated by Tidex pursuant to an "Operating Agreement" between Tidex and Oceanic.

Suit was filed on behalf of Barnabus Landry in December, 1979 against Oceanic, Mr. Landry's employer, based on the Jones Act and the general maritime law, and against Oceanic's insurer, Insurance Company of North America (hereinafter "INA") pursuant to the Louisiana Direct Action statute. Tidex was subsequently added as a party defendant and was also added as a third-party defendant by Oceanic. Pental Insurance Company, Ltd., [Pental] and American Home Assurance Company, insurers of Tidex, were also subsequently added as parties defendant and, upon the refusal of Pental, Tidex's primary insurer, to undertake the defense and indemnity of Oceanic, Pental and American Home were made third-party defendants by Oceanic. Because Mr. Landry was determined to be incapable of handling his own affairs due to the seriousness of his injuries, he was interdicted in accordance with Louisiana law, and his wife, Donna Landry, was substituted as plaintiff on his behalf prior to trial. After trial began, a compromise was reached between the parties and stipulated into the record. The stipulation took into consideration the possible verdicts, including the negligence of plaintiff, and provided for a joint funding of the settlement with the plaintiff of $2,500,000.00. The defendants, Oceanic and Tidex, reserved the right to litigate between themselves liability for the injuries to Mr. Landry. This trial ensued. After the presentation of four witnesses, the matter was submitted to the court for decision on that testimony, on the record, which includes numerous depositions, and memoranda of the parties.

After careful consideration of the record and the contentions of the parties, the Court now enters its Findings of Fact and Conclusions of Law.

## ISSUES OF LIABILITY

### FINDINGS OF FACT

1. Both the Bareboat Charter and the Operating Agreement affecting the M/V BETH TIDE on which Landry was injured were originally drafted and became effective on February 12, 1975. The original Bareboat Charter was between Tidewater Cameron, Inc., a subsidiary of Tidewater, Inc., and McDermott Saudi Arabia Company (an operating arm of Oceanic Contractors, Inc.), in regard to the M/V RED RIVER, a vessel owned by Tidewater Cameron. The charter of the M/V BETH TIDE was made effective by letters dated August 27 and September 3, 1979, on the letterhead of Tidewater, Inc., New Orleans, Louisiana, referencing the February 12, 1975, agreement and making it effective as between Oceanic and Tidewater Georgetown. The Operating Agreement of February 12, 1975, was made effective between Oceanic and Tidex by letter of September 3, 1979, from Mr. Nat Gladding, Operations Manager for Tidex, referencing the February 12, 1975, Operating Agreement between Tidex and McDermott Saudi Arabia Company concerning the operation of the M/V RED RIVER.

The BETH TIDE went on charter to Oceanic at 1200 hours on September 3, 1979, and remained on charter until November 16, 1979.

2. About October 10, 1979, the D/B 14 and its crew began the modification and refurbishing of the Y–2 fixed platform, owned by Arabian Oil Company, located in the Arabian Gulf off the coast of Saudi Arabia. As of November 4, 1979, the Y–2 platform had been placed back on line, pumping oil, with some work left including a small amount of sandblasting, painting, application of fireproofing material, and other finishing work.

3. From October 10 through November 4, the D/B 14 was located at the Y–2 plat-

form where work, including sandblasting and painting, was conducted from its deck.

4. Because the D/B 14 was required to undertake work in Hout oil field, some fifteen to twenty miles away, the sandblasting, painting and other equipment necessary to complete work on the Y–2 platform were off-loaded from the D/B 14 to the BETH TIDE on the morning of November 4, 1979. It was contemplated that the BETH TIDE would move equipment and personnel from the D/B 14 to the Y–2 platform each day, with work on the platform being carried out morning through evening, at which time the BETH TIDE would return to the D/B 14. This was, in fact, what occurred from November 4 through the time the job was completed on November 15.

5. On November 4, an air compressor, a volume tank, hose, paint, sand and other material necessary for the completion of the job, were off-loaded from the D/B 14 to the BETH TIDE, by Oceanic personnel, and the equipment was secured in place on the stern deck of the BETH TIDE by BETH TIDE crewmembers (Tidex employees) under the supervision of Capt. Theodosio and First Mate Davis Cuthbert.

6. The compressor, hose, volume tank and other equipment were used from the deck of the BETH TIDE for sandblasting work on the Y–2 platform on November 4, 1979 without problem or difficulty. At 1605 hours that day, the BETH TIDE departed the Y–2 platform, and at 1815 hours, the vessel docked alongside the DB–14, which still was under tow to Hout oil field. After dropping off the Oceanic personnel, the BETH TIDE proceeded to anchor, where she remained until 2354 hours that evening, when she was requested to return to the DB–14 location.

7. On November 5, at 0020 hours, the BETH TIDE arrived alongside the DB–14. At that time the air compressor on the BETH TIDE was to be used to air lift soil plugs from the main piles of the N/T–33 jacket, which jacket the DB–14 was in the process of removing. In connection with the soil plug lifting operation, Captain Pot-

ter had instructed foreman Esponge to switch the compressor setting from low to high speed, so that the lifting operation could be accomplished. The compressor was switched to high speed during the early morning hours of November 5. The BETH TIDE was alongside the DB–14 from 0020 hours to 0233 hours on November 5, and the compressor was set on high speed. However, because sea conditions deteriorated, the BETH TIDE was unable to remain alongside, and Oceanic's Captain Potter instructed the BETH TIDE to anchor to wait out the rough weather. The BETH TIDE remained at anchor throughout the remainder of November 5 because of the rough weather.

8. Capt. Theodosio, the master of the BETH TIDE, knew and understood that he and his crew were required to maintain watch over the equipment in their custody, including making sure that the equipment, including hoses, was properly secured and stowed in order to avoid damage.

9. While the master of the BETH TIDE viewed securing the vessel equipment, including the compressor, volume tank and hoses, as a duty of Tidex, he gave no instructions as to checking the stowage of the equipment during the period of rough weather. First Mate Cuthbert testified that he did not check the equipment, specifically the compressor and volume tank, to make sure they were properly stowed and secure during the rough weather from 0850 on November 4 until the time of the accident on November 6, with the exception of one check at approximately 3:00 p. m. on the afternoon of November 5. He has no recollection of looking at the hose which connected the air compressor and volume tank. Mr. Cuthbert saw no reason to instruct any member of the deck crew to check the equipment, although he did recognize that it was his responsibility, during rough weather, to look after safety of the equipment.

10. At approximately 0300 hours on November 6, the BETH TIDE was summoned to the DB–14. The BETH TIDE departed the DB–14 at 0445 hours, with 22 Oceanic

workmen aboard, and arrived at the platform at 0715 hours. In addition to the other non-Tidex personnel who had been aboard the BETH TIDE on November 4, Barnabus Landry was aboard to supervise sandblasting and rigging operations at the Y–2 platform. This is the same work Mr. Landry had performed aboard the D/B 14 while it was located at the Y–2 platform and the sandblasting and painting operations were being conducted from its deck.

11. When the BETH TIDE arrived at the Y–2 platform, the hose used to connect the air compressor and volume tank, which was known to be working properly when work ended on November 4, was found pinched under the edge of the steel plate which formed the base of the volume tank. Landry instructed Cheranama, the Oceanic foreman in charge of the sandblasters, to assist in lifting the volume tank to free the hose. After the hose was freed, it was connected between the compressor and the volume tank, and the compressor was then started by Cheranama, at which time a leak was discovered in the hose.

12. The policy of both Oceanic and Tidex, when a hole developed in a hose such as the one in question, was to discard the hose and obtain a new one.

Nevertheless, after the leak was discovered, Landry obtained some divers' tape, and instructed one of the Oceanic riggers to wrap the tape around the hole. When this was completed, the compressor was started, but the hose continued to leak. At that point Landry asked the chief engineer of the BETH TIDE, van Wyngaarden, whether there were any hoses aboard the BETH TIDE which could be used in place of the damaged hose. A search was conducted by the chief engineer, and two or three hoses were obtained; however, the couplings on those hoses did not fit the compressor or the volume tank. The chief engineer then obtained a smooth piece of pipe approximately two and one-half inches in diameter and 24 inches in length from the engine

room. He also brought the vessel's banding machine and band-it clamps to Landry.

13. Landry cut the hose at the point of damage, and inserted the pipe into the ends of the hose at the cut. The chief engineer then placed the first clamp over the hose, and tightened it with the banding machine. The chief engineer testified he was not certain Landry knew how to use the banding tool and thought it prudent to show Landry the proper procedure.

Mr. van Wyngaarden did not know how many of the bands should be used in this particular repair, nor did he know how much pressure would be applied to the hose or whether there were any specifications or limitations for the use of the banding machine in this particular application. This was the first time Mr. van Wyngaarden had used a banding machine for a repair such as this, his previous use of the machine involving repair of different hoses from the type in question used at lower pressures.

14. After putting the first band on the splice, Mr. van Wyngaarden left and did not observe the rest of the procedure used to splice the hose. Having left the scene before the splice was completed, Mr. van Wyngaarden had no knowledge as to how the hose and splice were secured or whether or not they were tied down in any way.

At that point Landry, assisted by several of the Oceanic personnel, completed the repair operation, placing a total of four clamps over the hose and pipe.

15. Testimony from the Oceanic riggers who claim to have helped Mr. Landry splice the hose suggests that he abandoned the banding machine after Mr. van Wyngaarden left him and used screw-type clamps from an Oceanic tool box to complete the splice. Other testimony suggests that Landry used the banding machine for all four clamps.* Whatever procedure was used to secure the hose to the pipe, it is uncontroverted that Tidex's engineer was responsible for furnishing the pipe, suggesting a

* Only one clamp was found at the scene of the accident, a clamp used with the banding machine.

method of repair, initiating the splice, and then leaving Mr. Landry, whom he knew to be inexperienced in such repairs, to succeed or fail in this dangerous undertaking without further assistance.

16. After the repair was completed, Landry instructed Exciminiano to tie the hose to a pipe in the bulwark of the vessel, the only suitable location near the hose. The hose was tied several feet from the pipe used to effect the repair.

17. Landry then instructed Cheranama to start the compressor. None of the witnesses can remember exactly how long the compressor ran before Mr. Landry was injured; estimates range from one to five minutes.

18. At approximately 0755 hours, Mr. Christopher Graham, a Quantity Surveyor employed by Bond, Foster, Gulf, Ltd., serving as a liaison between the platform owner, Arabian Oil Company, and the various contractors, including Oceanic, returned to the deck from the bridge of the BETH TIDE and stood next to Mr. Landry. Mr. Graham immediately saw the hose begin to rise up above the bulwarks of the BETH TIDE, almost six feet above deck. As he watched, the repair appeared to squeeze apart at the location of the splice "like toothpaste from a tube" and the metal pipe was thrown from the hose. Graham turned and ducked, shouting a warning to Landry, but Landry was struck in the head by the pipe.

## CONCLUSIONS OF LAW

### Oceanic's Negligence

■ 1. Oceanic was negligent and was thus liable to Landry under the Jones Act.

### Discussion

The hose in question, described as a canvas-clad fire hose, was designed for the transfer of water, and its use as a high-pressure air hose was improper. John B. Parnell, expert in the manufacture, design, use, function and failure analysis of high pressure hoses, testified that most air hoses have a reinforced outer covering which serves to protect the hose from scuffing, gouging, tearing and weathering. The exposed canvas covering on the subject hose was susceptible to external damage. Designed for flattened storage, the hose was also more likely to be pinched under heavy equipment than the reinforced rubber hoses customarily used for air compressors.

Furthermore, the 50-foot hose was too long for the approximately 10-foot distance between the compressor and the volume tank as they were placed on the deck of the BETH TIDE. The excess length was looped around the base of the compressor during use, exposed to risk of gouging, pinching and twisting.

The hose was tested to a pressure of 400 pounds per square inch (psi), with a safe working pressure of 200 psi. Sandblasting operations are generally conducted at 120 psi; the compressor, on its high setting, could produce 350 psi.

At the time of the accident, the hose was no more than a month old, and had been operated without incident. The hypothesis of the expert witnesses relied upon by Tidex to prove their contention that the hose in question was subject to the deleterious effects of exposure to petroleum products, specifically diesel fuel, which both degraded the quality of the rubber lining of the hose and created a slippery surface which prevented the splicing operation from being successful, is insufficiently supported by evidence in the record. The record does not document what the hose was exposed to subsequent to the accident; any oily content may have resulted from subsequent exposure to oil. Hoses used for diesel transfer on the DB-14 were kept separated from air and water hoses, and it was generally understood that hoses subjected to diesel transfer were not to be used for other purposes.

The uncontroverted testimony of foreman Jackson was that when Oceanic would conduct a compressor operation aboard a supply vessel away from the DB-14, normally an Oceanic mechanic or engineer would accompany the operation. This Oceanic engineer would maintain and repair the compressor and any of its appurtenances (in-

cluding hoses) as necessary. Whether to send out an Oceanic engineer was up to the DB–14's superintendent—Captain Potter. Furthermore, Gladding, the Tidex operations manager for the Middle East, testified that any time a charterer places equipment aboard a vessel, the charterer is expected to have qualified people on board to operate, maintain, and repair such equipment.

Since the compressor, sandblasting and painting operation was under the exclusive control and direction of Oceanic personnel, and it is uncontroverted that the Tidex crew had absolutely no responsibilities or duties with respect to such operation, Tidex was not required to furnish an engineer to remedy the situation by repairing the hose. Had Oceanic sent out their own engineer familiar with the intricacies of compressor operations and repairs, it is reasonable to assume that such engineer would have had the expertise and proper tools to effect a repair to the hose, or at least have known that a safe repair was not possible with the materials available on the BETH TIDE.

Since Oceanic elected not to send an engineer or mechanic with its equipment on this job, it was a fault also not to instruct its personnel with respect to the repairing of high pressure hoses. No such training ever was given. Since, as Captain Potter admitted, the canvas hoses sometimes developed leaks or became damaged, Oceanic had a duty to instruct its personnel with respect to the repair of such hoses. However, Oceanic gave no such training or instructions.

This Court finds testimony concerning the operation of the compressor to be in conflict and unclear. It has not been established that the setting of the compressor on low or high had any effect on the actual pressure exerted on the output hose during the first few minutes of operation, before the pressure in the volume tank reached the desired level. Therefore Tidex's claim that the setting of the compressor on high sometime prior to the accident was a contributing factor to the failure of the splice must be disregarded.

Negligence of Barnabus A. Landry

■ 2. Barnabus Landry was negligent and that negligence contributed significantly to the accident, so that his damages would have been diminished because of his negligence.

Discussion

Landry was negligent when he attempted to repair the hose rather than returning immediately to the DB–14 upon discovery of the damage to the hose. He was further negligent when he pursued the repair after it became evident that adequate repair parts were not available. He thus engaged in an unsafe method of repair.

Tidex contends that the protective head gear worn by Barnabus Landry at the time of his injury was a cause of, or a contributing factor to, his injury. Tidex contends that Mr. Landry's injury resulted, at least in part, from the fact that he was wearing a "bump cap" rather than a "hard hat" and that the lighter construction of the so-called "bump cap" resulted in, or at least contributed to, Mr. Landry's injury. The only evidence on this point is that of Mr. Fred Liebkemann, a mechanical engineer, who testified that, according to Tidex's hypothesis of the injury, the force generated by the pipe which struck Mr. Landry would far exceed the force against which so-called "hard hats" are designed to protect. More importantly, Mr. Liebkemann, given the opportunity to view pictures of Mr. Landry, taken after his injury, which clearly depicted the area of the injury, stated:

"No hard hat is going to protect an area there."

Based on Mr. Liebkemann's testimony, this Court finds as a fact that the type of head gear being worn by Mr. Landry at the time of his injury was neither a cause nor a contributing factor to his injury.

By stipulation in the record and as evidenced by Oceanic Exhibit No. 14, the release documents, the settlement agreement between Oceanic, Tidex and their underwriters and plaintiffs took into consideration any reduction of a final award to the plaintiffs based on the negligence of Mr.

Landry. This Court finds that as a result of the stipulation and agreement entered into by the parties, which took into consideration the reduction of the award for Landry's negligence, any negligence on the part of Mr. Landry is not attributable to Oceanic Contractors, Inc., in terms of the apportionment of fault.

Negligence of Tidex

■ 3. Tidex was negligent and was liable to Landry under the general maritime law.

### Discussion

At the time the Oceanic personnel departed the D/B 14 on the evening of November 4, 1979, the hose in question was in proper operating condition, the hose did not have a hole in it, nor was it pinched under any portion of the cargo on the BETH TIDE.

The hole in the hose in question resulted from the negligence and want of care of the crew of the BETH TIDE, during the period from the evening of November 4, 1979 through the morning of November 6, 1979, in failing to properly secure the equipment aboard the vessel, a task which they viewed as being their duty and which they undertook to perform, in failing to properly care for and observe the equipment in question, and specifically the hose, while it was in their care, custody and control during the period of rough weather from the evening of November 4 through the morning of November 6, and in failing to warn Oceanic of the damage sustained by its equipment while in the care, custody and control of Tidex.

A person of ordinary mechanical knowledge, and in particular a First Engineer of an oceangoing vessel, knew or should have known that the equipment being used to attempt the splice was improper and unsuited for the task at hand.

Cornelius van Wyngaarden was acting improperly and in a negligent manner in supplying the banding machine and pipe and initiating the splice of the hose in the manner described in his deposition. He was negligent also in undertaking to make the splice and was further negligent, after determining that Barnabus Landry did not know how to properly operate the banding machine, in not remaining on the scene to make sure that the banding machine was used in a proper manner and determining that the hose and pipe were secured so as to prevent injury. Barnabus Landry was entitled to rely on the supposed superior knowledge and understanding of Cornelius van Wyngaarden and, as a result, any negligent actions in the splicing of the hose in question are attributable to Mr. van Wyngaarden and not Mr. Landry.

Unseaworthiness of the BETH TIDE

4. The BETH TIDE was unseaworthy, but that unseaworthiness was not a legal cause of Landry's injury.

### Discussion

Construction of the Bareboat Charter/Operating Agreement on their face made Oceanic the owner pro hac vice of the vessel and liable for any unseaworthiness.

The warranty of seaworthiness was owed by Oceanic to Landry. On November 6, 1979, Barnabus Landry was aboard the BETH TIDE performing the same functions and fulfilling the same duties as he had aboard the D/B 14. He was a seaman and member of the crew of the D/B 14 and on the day of his injury was engaged in maritime work in furtherance of the mission of the BETH TIDE.

■ The damaged hose caused the vessel to be unseaworthy, but the damaged hose of itself did not cause the injury. Landry's improper use of seaworthy equipment, the banding machine and pipe, to repair the damaged hose caused the accident. A seaman may not recover for unseaworthiness under this circumstance. See Norris, The Law of Seamen (3d ed. 1970) § 621, p. 192.

■ The warranty of seaworthiness was owed by Oceanic to Landry. On November 6, 1979, Barnabus Landry was aboard the BETH TIDE performing the same functions and fulfilling the same duties as he had aboard the D/B 14. He was a seaman and member of the crew of the D/B 14 and on the day of his injury was engaged in

maritime work in furtherance of the mission of the BETH TIDE.

## Apportionment of Liability

5. After carefully considering all of the circumstances producing liability in this case, the Court concludes that Oceanic is responsible to the extent of 70% and Tidex is responsible to the extent of 30%.

## Indemnity

■ 6. The Indemnity provision in Article VIII of the Operating Agreement does not afford Tidex protection from liability in this case.

### Discussion

Article VIII provides in pertinent part as follows:

In consideration of the rate hereinabove set forth in Article IV, it is agreed that neither OPERATOR [Tidex], its underwriters, [Pental] nor the owner of the vessel [Tidewater Georgetown] shall have any liability or responsibility of any kind whatsoever for loss, damage, or expense to cargoes and/or equipment laden or carried by the vessel, however said loss, damage or expense may arise or occur whether through the negligence of operator, unseaworthiness of the vessel or otherwise. CHARTERER [Oceanic] agrees to protect, hold harmless and indemnify OPERATOR, [Tidex] its underwriters, the vessel, its owner, master and crew of and from any such loss, damage or expense . . .".

This provision clearly applies to loss, damage, or expense to cargoes or equipment carried by the vessel. The argument of Tidex that it follows from this provision that Tidex should have no liability for injuries caused by defective or damaged equipment placed aboard the vessel by Oceanic cannot be sustained.

■ 7. Oceanic is not entitled to indemnity from Tidex on account of Tidex having caused the unseaworthiness of the BETH TIDE by its breach of the warranty of workmanlike performance.

### Discussion

Oceanic argues that the burden of reparation should ultimately fall on the company whose fault caused the injury. Oceanic's own contribution of fault to the injury negates the validity of this argument.

## ISSUE OF INSURANCE COVERAGE

Oceanic contends that any liability it has to Landry is covered by certain policies of insurance issued by Pental Insurance Co., Ltd. to Tidewater, Inc., and others, including Tidex, pursuant to the obligation of Tidex in the Operating Agreement to provide insurance for Oceanic. It further contends that Pental was obligated under the terms of those policies to defend it in this suit.

Tidex contends that any obligation it had under the Operating Agreement to provide insurance coverage for Oceanic was nullified by Oceanic's breach of that agreement by using the barge for purposes other than those contemplated by the agreement, that is, as a workplace for the sandblasting operation. Tidex and Pental further contend that, even if the Operating Agreement was not breached, the insurance policy issued by Pental affords no coverage to Oceanic in this case.

## FINDINGS OF FACT

### Coverage of Oceanic

1. The Operating Agreement between Tidex and Oceanic provided for Tidex to procure Protection and Indemnity Insurance as follows:

In consideration of the rate . . . set forth . . . in Article IV . . . OPERATOR [Tidex] shall procure Protection and Indemnity Insurance in the amount of $1,000,000.00 on the Ocean P & I Clauses SP–23 Form (or substantially equivalent form), including . . . crew coverage . . .

The Operating Agreement further provides that the P & I Insurance so procured . . . shall name the vessel owner and CHARTERER [Oceanic] as additional assureds . . .".

2. Two policies of Hull and Marine Liability Insurance were issued by Pental In-

surance Co., Ltd., to Tidewater, Inc., and related companies for the period April 1, 1979 to April 1, 1980, bearing numbers M–1900–A and M–1900–B. The two policies are identical except that the vessels named in the schedule of vessels insured under M–1900–A are different from those named in M–1900–B. The M/V BETH TIDE is listed as an insured vessel under Policy No. M–1900–B. Tidex explains that Policy No. M–1900–A applies to Tidewater domestic operations, and Policy No. M–1900–B applies to Tidewater foreign operations. For purposes of this case Policy No. M–1900–B will be considered as the policy procured pursuant to the Operating Agreement.

'3. Tidex was one of the named insureds in the policy which provided for marine liability insurance in the amount of $1,000,-000.00. Oceanic was included as an additional assured under the following provision:

DEFINITION OF NAMED ASSURED (Extent of Coverage)

\* \* \* \* \* \*

The unqualified word "Assured" includes (1) the "Named Assured"; ... (3) Any person, organization, trustee or estate to whom or to which the "Named Assured" is obligated by virtue of a contract or agreement to include or name as an assured, co-assured or additional assured. Section C, Paragraph 4.

4. The coverage provided for additional assureds is stated thus:

With respect to those included in category (3) set forth in the immediately preceding paragraph, this policy affords insurance, subject to its terms and conditions, but: only for liabilities that may be imposed against the Named Assured by law in the absence of contract; and only to the extent such liability arises directly out of those operations the Named Assured is obligated to perform by virtue of a contract between the Named Assured and such other assured; and only to the extent and within the limitation of the Named Assured's obligations to include or name such assured as an assured, co-assured or additional assured as set out in

such contract between the Named Assured and such other assured; and only to the extent that such liability and operations are covered by this policy. In no event shall insurance coverage be afforded hereunder to such other assureds to any greater extent than that which the Named Assured is expressly obligated by contract to provide.

5. This provision of Section C, Paragraph 4 limited the coverage stated in Section C "INSURING AGREEMENTS", Paragraph 1, "COVERAGE":

The Company hereby agrees to pay on behalf of the Assured or to indemnify the Assured for all sums which the Assured may become legally obligated to pay by reason of the liability imposed the Assured by law, or assumed by the Assured under contract,

(a) PERSONAL INJURY LIABILITY For damages, including damages for care and loss of services, because of personal injury, sickness or disease including death at any time resulting therefrom, sustained by any person or persons;

6. Pental's agreement to defend suits against the Assured is contained in Paragraph 3 of Section C:

"With respect to such insurance as is afforded by this policy, the Company shall:

(a) Defend any suit against the Assured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; \* \*

CONCLUSIONS OF LAW

■ 1. The Operating Agreement was not breached so as to nullify the obligation of Tidex to provide insurance coverage. The Operating Agreement contained a clear protest clause. Any ambiguity in the range of support functions contemplated in the Operating Agreement was to be construed against the party seeking to invalidate the contract, Tidex. The questionable use of

the vessel as a work platform was open and notorious, with full knowledge of Tidex. Tidex made no protest, therefore Oceanic did not breach the operating agreement.

2. The Pental policy affords no coverage to Oceanic.

■ 3. The limiting language in Paragraph 4 means first that coverage is never afforded an additional assured for liability that has been assumed by the named assured under contract, and second that coverage is afforded an additional assured only for liability that could be imposed against a named assured by law. In other words, if the liability of the additional assured is not liability that could be imposed against the named assured by law, the additional assured is not afforded coverage under the Pental policy.

■ 4. The limiting provision means that coverage is afforded Oceanic only if it is liable vicariously, or otherwise, for liability which is imposed against Tidex by law. Any liability of Oceanic which is independent of liability of Tidex is not covered by the policy. The liability of Oceanic in this case is not predicated upon any liability of Tidex, therefore there is no coverage.

■ 5. The argument of Oceanic that failure of coverage under the policy is a breach of the Operating Agreement which results in liability of Tidex in damages cannot be sustained. The Operating Agreement does not bind Tidex to provide insurance without limitation and without exceptions to coverage.

Defense Owed Oceanic

■ 6. On the issue of defense owed under the policy, Oceanic appropriately points out that it is hornbook law that the question of whether or not an assurer owes a defense to an assured is much broader than the question of coverage for liability. Pleadings which can be construed to state a factual situation under which there would be coverage under the policy obligate the assurer to defend.

7. Tidex argues only that Oceanic is not entitled to a defense because there was no insurance afforded Oceanic for the reason that the Operating Agreement requiring Tidex to provide insurance was breached by Oceanic. This contention has been decided adversely to Tidex. Oceanic is entitled to recover from Pental attorneys' fees and costs of defending this lawsuit.

8. Cases relied upon by Oceanic as decisive of the issue of coverage under the policy do not involve provisions similar enough to the provisions of the policy here to be persuasive on the issue of coverage.

Waiver of Subrogation

9. The waiver of subrogation in Section E, Paragraph 10, prevents Pental from seeking recovery from Oceanic for any payment under the policy to Tidex.

Discussion

■ Under the subrogation provision Pental waived "their right of subrogation, when the Assured is obligated, by virtue of a contract or an agreement to secure Company's waiver of subrogation, against any individual, firm, corporation * * * for whom or with whom the Assured may be operating or for whom the Assured has agreed to waive subrogation * * *." Tidex argues that the Operating Agreement was breached, therefore there is no insurance coverage and the waiver of subrogation is void and unenforceable as to Oceanic. This argument falls for the same reason that Tidex's defense argument fell—there was no breach of the Operating Agreement.

Oceanic is directed to submit to the Court on or before September 15, 1982 proof of its attorneys' fees and costs of defending this lawsuit. After that determination is made by the Court, the Clerk is directed to enter judgment in accordance with these Findings of Fact and Conclusions of Law.