Barnabus Abel LANDRY, et al., Plaintiffs,

v.

OCEANIC CONTRACTORS, INC., (McDermott International, Inc.,) and Insurance Company of North America, Defendants Third Party Plaintiffs-Appellants Cross-Appellees,

v.

TIDEX INTERNATIONAL, INC., et al., Third Party Defendants-Appellees Cross-Appellants.

No. 83–3131.

United States Court of Appeals, Fifth Circuit.

May 7, 1984.

Lugenbuhl, Larzelere & Ellefson, Vance E. Ellefson, New Orleans, La., for Oceanic.

Gelpi, Sullivan, Carroll & LaBorde, Cliffe F. LaBorde, Gerald T. Gelpi, New Orleans, La., for Tidex International, Inc. and Pental Ins. Co., Ltd.

Before GEE, RANDALL and JOHNSON, Circuit Judges.

GEE, Circuit Judge:

Barnabus A. Landry brought this suit based on the Jones Act, 46 U.S.C. § 688 (1976), and general maritime law to recover for injuries suffered while he was working on an oil production platform in the Arabian Gulf. During trial, Landry entered into a settlement for $2,500,000 with the defendants: his employer, Oceanic Contractors, Inc. ("Oceanic") and the owner of the vessel on which he was injured, Tidex International, Inc. ("Tidex"). Oceanic and Tidex, who jointly funded the settlement, reserved the right to litigate liability for Landry's injuries between themselves.

The district court found Oceanic 70 percent negligent and Tidex 30 percent negligent. 548 F.Supp. 337. It also held that while Tidex's vessel, the M/V BETH TIDE, was unseaworthy, its unseaworthiness was not the legal cause of Landry's injury. Finally, the court held that Pental Insurance Co. ("Pental"), who was made a third-party defendant by Oceanic, was not required to indemnify Oceanic, but was obligated to defend it under the terms of a policy it had issued to Tidex. Both Tidex and Oceanic appeal. We affirm.

## I. Facts

Oceanic entered into an Operating Agreement in September 1979 whereby Oceanic became the bareboat charterer of Tidex's vessel the BETH TIDE. In November 1979, Oceanic began to use the BETH TIDE to assist in the refurbishing of the Y–2 fixed platform, located in the Arabian Gulf. This work had been begun by the crew of the D/B 14, a derrick barge which was located at the Y–2 platform.

The BETH TIDE replaced the D/B 14 because the barge was needed for work in the Hout oil field some 20 miles away. It was contemplated that the BETH TIDE would move equipment and personnel from the D/B 14 to the Y–2 platform each morning and would return them to the D/B 14 each evening.

On November 4, an air compressor, a volume tank, hose, paint, sand, and other material were offloaded from the D/B 14 to the BETH TIDE by Oceanic personnel. The equipment was secured on the stern deck of the BETH TIDE by BETH TIDE crewmembers (Tidex employees). That day the equipment was used from the deck of the BETH TIDE for sandblasting work on the Y–2 platform. The next day the vessel remained at anchor because of rough weather.

On the morning of November 6, the BETH TIDE transported 22 Oceanic workers to the platform. Among these was Landry, who was aboard to supervise operations at the platform. When the BETH TIDE arrived there, the hose used to connect the air compressor and volume tank was found pinched under the volume tank. When Landry tested it, he discovered a leak. He tried unsuccessfully to patch the hose with divers' tape. He then asked the BETH TIDE's chief engineer, van Wyngaarden, whether there were any replacement hoses aboard the BETH TIDE. None could be found.

Landry then attempted to repair the hose with a piece of pipe, cutting it at the point of damage and inserting the pipe into both ends of the hose at the cut. Van Wyngaarden then showed Landry how to attach band-it clamps on the hose with the ship's banding machine. After putting the first band on the splice, van Wyngaarden left. Landry, assisted by several Oceanic personnel, completed the repair, placing a total of four clamps over the hose and pipe.

Landry then instructed a worker to start the compressor. In a moment, the repair squeezed apart at the splice and the metal pipe escaped from the hose, striking Landry on the head and injuring him severely.

## II. Negligence of Oceanic

The district court found that Oceanic was negligent because the use of such a

hose under high pressure was unsafe, the length of the hose created an unreasonable risk that it would be gouged or pinched, Oceanic failed to send an engineer or mechanic knowledgeable in compressor and hose repairs, and Oceanic failed to instruct its personnel in the repair of high pressure hoses.

Oceanic maintains that the finding of inadequate training was clearly erroneous because uncontroverted evidence showed that Oceanic had a policy against repairing such hoses when damaged. This is a misleading contention. It is true that Oceanic's safety supervisor testified that the splicing of hoses such as those used here was an unsafe practice. There is no record testimony, however, that Oceanic had instructed its employees not to repair such hoses. Indeed, Edward Potter, Landry's supervisor, stated in his deposition that such hoses had been spliced before and that he approved of the procedure. Potter also testified that he had never read anything stating that the procedure was dangerous or heard about it in safety meetings. Given this testimony, we do not find clearly erroneous the trial court's finding that Oceanic was negligent in failing to instruct its employees in safe procedures for hose repair.

■ Oceanic also argues that even if it was negligent, its negligence was not the proximate cause of Landry's injuries. However, the traditional "proximate cause" test is not applicable to Jones Act claims; rather, in such a claim, a defendant must bear responsibility for his negligence if such negligence played any part, even the slightest, in producing the injury. *Chisholm v. Sabine Towing & Transportation Co.*, 679 F.2d 60, 62 (5th Cir.1982). Oceanic's conduct clearly played a part in producing the injury: with proper training, or with a skilled engineer present, Landry would never have attempted to repair the hose.

■ Oceanic argues that this finding of "producing cause" is inconsistent with the district court's statement that "the damaged hose itself did not cause the inju-

ry." 548 F.Supp. at 344. Oceanic takes this statement out of context and confuses the legal standards applicable to the various claims. The district court found that the damaged hose caused the vessel to be unseaworthy, but that the unseaworthiness did not cause the injury. *Id.* This conclusion does not preclude a finding that the *negligence* which damaged the hose caused the injury; the standard required to prove causation as a result of a vessel's unseaworthiness is *more demanding* than that for recovery under Jones Act negligence in that it requires proof of causation in the traditional sense. *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir.1983). Thus it was quite consistent for the trial court to hold that the unseaworthiness (resulting from the damaged hose) did not cause Landry's injury, while Oceanic's negligence (in damaging the hose) did cause it.

### III. Negligence of Tidex

■ The district court found that Tidex was 30 percent negligent. It held that the hole in the hose resulted from the negligence of the BETH TIDE crew in failing to secure the compressor or the volume tank properly, failing to care for the equipment properly, and failing to warn Oceanic of the damage caused to the equipment. In addition, the court found Tidex negligent in that van Wyngaarden, First Engineer of the BETH TIDE, negligently supplied the banding machine to Landry, initiated the splicing of the hose, and did not remain to ensure that the banding machine was used in a proper manner. 548 F.Supp. at 344.

Tidex argues that these conclusions are not supported by the evidence. It is well established that findings of fact in admiralty cases are binding unless clearly erroneous. *Cheek v. Williams-McWilliams Co.*, 697 F.2d 649, 652 (5th Cir.1983). Questions of negligence and proximate cause in admiralty cases are treated as fact questions. *Id.*

■ The evidence in the record supports the trial court's finding of negligence. Captain Teodosio of the BETH TIDE stated in his deposition that the hose was not tied

down, but merely lying loosely on top of the compressor and volume tank. There was uncontroverted testimony that the hose was found "smashed under" the volume tank, and that the leak was located in the part of the hose that had been under the tank. The BETH TIDE crew checked to see whether the equipment was properly stowed only once.[1] Because evidence of the "slightest negligence" is sufficient to sustain a finding of Jones Act liability, we find that this conduct was negligent. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir.1977).

■ The evidence also supports a finding that van Wyngaarden was negligent. Every safety expert testified that it would be improper to splice the hose used here and then to use it under pressure. Moreover, van Wyngaarden himself testified that he provided Landry with the banding tool, showed Landry how to use it, and left before Landry finished splicing the hose. Van Wyngaarden should have known that the splicing procedure was dangerous; thus, his conduct was negligent. Because van Wyngaarden was acting within the scope of his employment, the negligence can be imputed to his employer Tidex. *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 222 (5th Cir.1975) (respondeat superior applies to Jones Act cases).

## IV. Insurance Coverage

Oceanic contends that any liability it has to Landry is covered by certain policies of insurance issued by Pental Insurance Co. ("Pental") pursuant to the obligation of Tidex in the Operating Agreement to provide insurance for Oceanic.

Section VIII(a) of the Operating Agreement requires Tidex to "procure and maintain in effect ... Protection and Indemnity Insurance in the amount of $1,000,000.00 on the Ocean P & I Clause SP–23 Form (or substantially equivalent form), including Collision/Towers Liability, and crew coverage...."

Pental issued to Tidewater, Inc. and related companies a policy of Hull and Marine Liability Insurance for the period April 1, 1979 to April 1, 1980. The policy, which provided for marine liability insurance in the amount of $1,000,000, listed the M/V BETH TIDE as an insured vessel and Tidex as one of the named insureds. Oceanic was included as an additional assured under a provision stating that the word "assured" includes "[a]ny person, organization, trustee or estate to whom or to which the 'Named Assured' is obligated by virtue of a contract or agreement to include or name as an assured, co-assured or additional assured."

### A. Breach of Agreement Nullifying Obligation to Insure

■ Tidex argues that its obligation to provide insurance coverage for Oceanic was nullified by Oceanic's breach of that agreement by using the M/V BETH TIDE for purposes other than those contemplated by the agreement. Section V of the Operating Agreement provides:

> The vessel shall be employed solely in the lawful movement of supplies, equipment and other materials and personnel incidental to operations of CHARTERER in offshore and riparian construction in the Arabian Gulf.

It is undisputed, however, that the BETH TIDE was used as a work platform from which sandblasting operations took place. This constituted a breach of the agreement; sandblasting operations cannot be considered "the lawful movement of supplies" or other materials.

The district court held, however, that Tidex waived the right to complain about the breach by failing to make use of a protest clause contained in the Operating Agreement. In so holding, the district court erred. The protest clause provides:

> [I]f any operation, voyage, movement, activity or inactivity on the part of OPERATOR and/or vessel is insisted upon by CHARTERER ... and undertaken by the master of the vessel under protest on account of the opinion of the master that said operation ... is hazardous and likely to cause loss, damage or expense, or loss of life or personal injury, provided the master's protest is reasonable, *the re-*

---

1. Captain Teodosio also "glanced" at the equipment every hour or so from the bridge.

*sponsibility for such loss, damage or expense, or loss of life or personal injury, shall thereupon rest solely upon CHARTERER.*

(emphasis added). The clear import of this provision is to shift liability when a master, under protest, has followed the orders of the charterer even though he believed such orders to be dangerous. The provision does not suggest that the operator must protest when the charterer *breaches* the agreement; rather, in order to shift liability, he must protest when the charterer *insists upon hazardous activity.*

■ While the protest clause does not affect Tidex's right to rescind the Operating Agreement in the face of Oceanic's breach, Tidex has indeed waived the right to rescind by continuing to accept performance from Oceanic. The right to rescind is waived when a party continues to accept performance from the other party with knowledge that the contract has been breached. A. Corbin, 3A *Corbin on Contracts* § 755 at 497 (1960); *Cuna v. Elton Lumber Co.,* 148 La. 1097, 88 So. 493, 494 (1921); *Calhoun v. American Marine Corp.,* 159 So.2d 19, 22 (La.App.1963); *Justiss-Mears Oil Co. v. Pennington,* 132 So.2d 700, 706 (La.App.1961).

. ■ Gladding, Tidex's operations manager for the Middle East, stated in his deposition that he became aware of the circumstances of Landry's injury and the use of the BETH TIDE for sandblasting activities "while the vessel was still up in location." Yet Tidex did not ask that the agreement be cancelled or renegotiated, did not protest to Oceanic that it had breached the agreement, indeed did nothing until Oceanic pointed out during the course of litigation that it was covered by the Pental policy and entitled to indemnity. Under these circumstances, we hold that Tidex waived the right to rescind the agreement because of Oceanic's breach.

### B. Coverage of the Insurance Policy

■ Oceanic argues that the district court erred in holding that the insurance policy issued by Pental affords no coverage to Oceanic in this case. Under the terms of the policy, Pental agrees to indemnify the assured for personal injury liability. The extent of coverage for additional assureds, such as Oceanic, is limited to "liabilities that may be imposed against the Named Assured by law in the absence of contract." The district court construed this phrase to mean: (1) Oceanic is covered "if it is liable vicariously, or otherwise, for liability which is imposed against Tidex by law," (2) except that coverage is not afforded "for liability that has been assumed by the named assured under contract." Because the liability of Oceanic in this case is not predicated upon any liability of Tidex, the district court found no coverage.

We agree with the district court's interpretation of the contract provision. Clearly, the provision consists of two parts. The first provides that additional assureds are covered under the policy *only* for liabilities that could be imposed against the named assured (here Tidex) by law; in other words, the liability of Oceanic must be predicated on some legal liability of Tidex. The second states that additional assureds will not be covered for liabilities imposed upon the named assured by contract. It is the first part that concerns us here. Oceanic has been found liable for its *own* negligence, not for that of Tidex. We cannot say that Oceanic's liability for its own negligence is liability that could have been imposed upon Tidex. Thus, there is no coverage under the policy.

### C. Failure of Coverage as Breach of Agreement

Oceanic argues that the failure of coverage under the policy is a breach of the Operating Agreement. As we stated above, the Operating Agreement provides that Tidex must procure and maintain "Protection and Indemnity Insurance in the amount of $1,000,000.00 on the Ocean P & I Clauses SP–23 Form (or substantially equivalent form)." This it did. The Operating Agreement does not require Tidex "to provide insurance without limitation and without exceptions to coverage." 548 F.Supp. at 347.

■ If Oceanic was not satisfied with the provisions of the policy, it had

ample opportunity to negotiate modifications prior to this litigation. Oceanic makes the preposterous argument that it could not have negotiated because the Operating Agreement states that Oceanic will not be provided with copies of the policies of insurance obtained by Tidex. This is simply not true. The Agreement provides that Tidex keep the *original* policy document, but does not prevent Oceanic from keeping *copies* of the policy. Indeed, the Agreement requires that "proper evidence [of the policy] shall be held by CHARTERER [Oceanic]." Thus, we cannot say that failure of coverage under the policy breaches the Agreement.[2]

As we find all the claims on appeal to be without merit, the judgment of the district court must be

AFFIRMED.

---

**2.** Finally, Pental argues that because the district court found that the Pental policy did not provide coverage to Oceanic, Oceanic was not entitled to a defense by Pental. We need not reach this argument as it was not raised in the trial court. *Pierre v. United States,* 525 F.2d 933, 936 (5th Cir.1976). We do note, however, as did the trial court, that an assurer is obligated to defend if the pleadings can be construed to state a factual situation under which there would be coverage under the policy, *irrespective* of the assured's ultimate liability to the plaintiff. 548 F.Supp. at 347. *See* J. Appleman, 7C *Insurance Law and Practice* § 4683 at 42 (1979).