Charles **VICKERS,** Plaintiff-Appellant,

v.

**CHILES DRILLING CO.,**
Defendant-Appellant,

v.

**INGERSOLL–RAND CO.,**
Defendant-Appellee.

No. 86–4534.

United States Court of Appeals,
Fifth Circuit.

July 22, 1987.
Rehearing Denied Aug. 20, 1987.

James E. Diaz, Sr., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Chiles Drilling Co.

Philip G. Hunter, Leonard Fuhrer, Fuhrer, Flounoy, Hunter & Morton, Alexandria, La., for Vickers.

Grove Stafford, Jr., Alexandria, La., for Ingersoll-Rand Co.

Before WISDOM, WILLIAMS and HILL, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Charles Vickers was hurt while working as part of a crew moving a large air compressor off of the drilling rig GULF-STREAM. He appeals a judgment of the district court that the air compressor was not defective. We reverse and remand.

I. *Facts*

Charles Vickers worked as a roustabout for the Chiles Drilling Co. on its offshore jack-up rig, the GULFSTREAM. The parties have stipulated that Vickers was a Jones Act seaman.

On April 8, 1982, Vickers and other members of the Chiles crew undertook to move a large air compressor off of the GULF-STREAM to a supply boat.[1] The air compressor was large: seven feet high, five feet wide, and fourteen feet long. It was mounted on wheels for road towing and also had an "eye" in the roof so it could be lifted by crane.

Keith LeDoux, Chiles' crane operator, supervised the moving operation. He used two cranes to move the compressor. First, he moved the compressor from the deck where it had been used to a pipe rack on the starboard side of the rig, within reach of the second crane. Then he used the second crane to move the compressor from the pipe rack to the supply boat. Vickers connected and disconnected the compressor to the two cranes.[2] In the first move,

---

[1] The Marine & Industrial Electric Service Co. (M & I) had used the compressor to sandblast and paint the GULFSTREAM. On April 8, the compressor broke, and the supply boat brought a new compressor to trade for the old one.

[2] The district court found—from conflicting trial testimony—that a twenty foot sling, or cable, was attached to the lifting eye and that Vickers actually connected the cranes to the sling, rather than directly to the eye. We affirm this

Vickers safely climbed atop the compressor, connected the first crane to the sling, and climbed down. In the second move, Vickers safely climbed atop the compressor, disconnected the first crane, connected the second crane, and jumped off of the compressor.[3] He landed on the pipe rack, which was wet and slippery, and hurt his knee.

Vickers sued Chiles Drilling, M & I Electric, and Ingersoll-Rand, the manufacturer of the compressor. After a bench trial, the district court found that (1) the compressor was not defective for its normal use, (2) the GULFSTREAM was unseaworthy, (3) Chiles was negligent in ordering Vickers to climb on top of the compressor, and (4) Vickers was negligent in jumping off of the compressor. The district court found that Chiles and Vickers contributed, respectively, 55 percent and 45 percent to Vickers' injuries and awarded judgment against Chiles for $277,105.52, which amounted to 55 percent of Vickers' damages.

Vickers now has settled his claims with all defendants except Ingersoll-Rand.[4] On appeal, he claims the compressor was defective. He also claims that the district court improperly failed to award damages for mental anguish.

First, we review the relevant trial testimony and the district court's order. (Part II of this opinion). Then we summarize the applicable law. (Part III). Next, we hold that the compressor was defective, and we remand for the district court to reapportion fault among the defendants. (Parts IV and V). Finally, we remand to the district court for it to reconsider whether and how much Vickers may recover for mental anguish. (Part VI).

## II. *The Testimony Concerning the Compressor*

As set out above, the air compressor had a lifting eye in its roof to which a crane or sling could be attached. In order to provide access to the eye, Ingersoll-Rand built a step inside the compressor and a door in the ceiling that opened to the roof. Someone standing on the step could open the ceiling door and reach the lifting eye. Alan Dorris, Ingersoll-Rand's expert, testified that such internal access provided the safest means of reaching the lifting eye, because it eliminated the risk of falling off of the roof or a ladder.

Unfortunately, neither Vickers nor his crew mates knew about the internal access. The ceiling door was hidden from view, and no notice on the compressor informed workers of the internal roof access. Even Dorris admitted that "if you were not making an effort to look for it, I don't think you would notice [the ceiling] door."

The district court found that the ceiling door was "difficult to detect." It suggested that Ingersoll-Rand "might have been well advised" to print a notice on the compressor advertising the obscure, internal access. The court went on, however, to hold that the compressor was not defective for "normal" use, because, "in normal operations, [the] compressor would have been moved by or in the presence of painters" who knew about the internal access.

## III. *Applicable Law*

■ As set out above, the parties have stipulated that Vickers was a Jones Act seaman. The GULFSTREAM was a jack-up rig, which may be a "vessel" for purposes of maritime law. *See Hicks v. Ocean Drilling and Exploration Co.*, 512 F.2d 817, 824 (5th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976); *Marathon Pipeline Co. v. Drilling Rig Rowan/Odessa*, 761 F.2d 229, 223 (5th Cir.1985). Vickers brought his suit under the Jones Act and general maritime law.

■ The Supreme Court recently described general federal maritime law as an

---

finding as not clearly erroneous. *See* Fed.R. Civ.P. 52.

jumped, and we affirm this finding as not clearly erroneous. *See* Fed.R.Civ.P. 52.

**3.** At trial, there was testimony both that Vickers slipped and that he jumped off of the compressor roof. The district court found that he

**4.** Vickers settled with Chiles for $300,000 and agreed to pay Chiles any amount, up to $300,000, he recovers from Ingersoll-Rand.

"amalgam of traditional common law rules, modifications of those rules, and newly created rules" "drawn from state and federal sources." *East River Steam Ship Corp. v. TransAmerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986). Strict products liability is part of the general maritime law. *Id.* 106 S.Ct. at 2299; *Ali v. Offshore Co.*, 753 F.2d 1327, 1332 n. 11 (5th Cir.1985) (a products liability claim within admiralty jurisdiction is governed by federal maritime law). In developing this law, courts have consulted state laws, *see State of Louisiana v. M/V TESTBANK*, 752 F.2d 1019, 1031 (5th Cir. 1985) (en banc), and also the Restatement of Torts, *see Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 123 (3d Cir.1984); *Pan Alaska Fisheries Inc. v. Marine Construction and Design Co.*, 565 F.2d 1129, 1134 (9th Cir.1977) (Restatement § 402A is the "best and most widely-accepted expression of the theory of strict liability"); *McKee v. Brunswick Corp.*, 354 F.2d 577, 584 (7th Cir.1965). With this framework in mind we address Vickers claim against Ingersoll-Rand.

## IV. *Design Defect*

The Restatement (Second) of Torts § 402A ("§ 402A") provides:

(1) one who sells any product in a defective condition unreasonably dangerous to the user ... is subject to liability for physical harm thereby caused to the ultimate user ... if

(a) the seller is engaged in the business of selling such a product, and

(b) [the product] is expected to and does reach the user ... without substantial change in the condition in which it is sold.

Ingersoll-Rand clearly was a "seller ... engaged in the business of selling" air compressors. *See* § 402A comment f.

■ In order to recover from Ingersoll-Rand, Vickers must show that the compressor was defective and unreasonably dan-

gerous for its "normal" use. *See* Restatement (Second) of Torts § 402A comment h (product not defective if "safe for normal handling and consumption"). We hold that in admiralty cases, the "normal" use of a product includes all reasonably foreseeable uses, including foreseeable misuse. This is the virtually universal rule in all states. *See e.g., LeBouef v. Goodyear Tire & Rubber Co.*, 623 F.2d 985, 989 (5th Cir.1980) (under Louisiana law, normal use includes all reasonably foreseeable use or misuse); *Ragsdale Bros., Inc. v. Magro*, 693 S.W.2d 530, 541 (Tex.App.—San Antonio 1985) (under Texas law, seller liable if product unreasonably dangerous for foreseeable use), *rev'd on other grounds*, 721 S.W.2d 832 (Tex.1986); *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 351 (Tex.1977), *rev'd on other grounds, Duncan v. Cessna Aircraft Corp.*, 665 S.W.2d 414, 428 (Tex. 1984); *Duncan*, 665 S.W.2d at 423 (foreseeable misuse does not bar strict products liability but is subsumed under concept of contributory negligence).

■ As set out above, the district court found that only painters familiar with the internal roof access could move the compressor in "normal" use. We reverse this finding as clearly erroneous. The use of the compressor was not limited to painting. Ingersoll-Rand had the obligation to foresee that a crew of non-painters, unfamiliar with the internal access system, would lift the compressor by crane and that a crew member would climb to the roof to reach the eye. Thus, Vickers was hurt while moving the compressor in "normal" use.[5]

■ We also hold that the compressor was unreasonably dangerous for normal use because of its design. *See Ocean Barge Transport*, 726 F.2d at 124 (in admiralty, a product may be unreasonably dangerous because of defective design); *see also Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 337 (5th Cir.1984) (strict liability in admiralty includes theory of defective design). We agree with cases hold-

---

5. Moreover, Ingersoll-Rand could not make the compressor safe for *Vickers* by telling *painters* about the safe interior access. *See Pan Alaska Fisheries*, 565 F.2d at 1136. Even if the com-

pressor was not unreasonably dangerous to painters who had been told about the interior access, it still was unreasonably dangerous to other foreseeable users, such as Vickers.

ing that to decide whether a product is defectively designed and unreasonably dangerous, we may consider how easily the manufacturer could have designed a safer alternative product. *See e.g., Halphen v. Johns-Manville Sales Corp.*, 484 So.2d 110 (La.1986) (Louisiana law); *Hebert v. Outboard Marine Corp.*, 638 F.Supp. 1166, 1171 (E.D.La.1986) (admiralty case following Louisiana law); *Shipp v. General Motors Corp.*, 750 F.2d 418, 421 (5th Cir.1985) (applying Texas law, considering availability of safer substitute products and manufacturer's ability to cure defects). In the case before us, Ingersoll-Rand easily could have attached a notice to the compressor, explaining the availability of interior access to the roof. Ingersoll-Rand's failure to do so constitutes a defect in design.[6]

We also hold that this design defect, an obscure safety protection which easily could have been made available by notice, made the compressor unreasonably dangerous. Ingersoll-Rand knew or should have known that a worker such as Vickers might climb to the compressor roof when, without notice, it could be expected that the safe internal access would remain unknown. Climbing on top and jumping off of the seven-foot-high compressor created unreasonable dangers for Vickers.[7]

The comments to § 402A of the Restatement support our holding. Comment i explains that a product is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer...." In the case before us, an ordinary consumer reasonably would expect the compressor to be equipped with a safe means of access to the roof. Comment j recognizes that "[i]n order to prevent the product from being unreasonably dangerous, the seller may be required to give directions ... as to its use." As we hold, this is exactly what Ingersoll-Rand should have done.

## V. *Causation*

In this appeal, we decide only that Ingersoll-Rand defectively designed its compressor by failing to inform users of the internal roof access. We do not decide whether this defect was a legal cause of Vickers' injuries.

Ingersoll-Rand argues that any defect in its compressor did not cause Vickers' injuries and that the danger of climbing on top of the compressor was obvious. Ingersoll-Rand notes that Vickers could have used a ladder to climb on and off the roof. Chiles employees, including LeDoux, testified that Vickers could have used a ladder if he wanted to, although Vickers testified that LeDoux rushed him to finish the job quickly, before he could get a ladder. Ingersoll-Rand also argues that Vickers' second, unfortunate trip to the compressor roof was not necessary. As set out above, a twenty-foot sling connected the compressor to the GULFSTREAM's cranes. This sling could hang from the lifting eye over the side of the compressor to the ground. The district court found that after lifting the compressor to the pipe rack, LeDoux could have lowered the crane's hook along-side the compressor rather than atop its roof, allowing Vickers to switch the cranes while standing on the deck beside the compressor.

These arguments relate to causation, or the degree to which Vickers and Chiles caused the injuries, and we remand for the district court to apportion causation, given the evidence presented at trial. Even though Vickers has settled with all defendants except Ingersoll-Rand, the district court on remand should apportion causa-

---

**6.** Percy Miller, Vickers' expert engineer, also testified that the compressor's roof had a slippery surface and that a non-slip surface would better protect workers standing on the roof. As set out above, the district court found that Vickers jumped and did not slip off of the compressor, and the trial testimony of Keith LeDoux supports this finding. The district court did not discuss whether the slippery roof forced Vickers to jump off rather than to climb down, but no evidence in the record weighs either way as to such a conclusion.

**7.** Compressors similar to the one involved in this case vary in size and in the degree of danger to persons getting to and working on the roof. Thus, we make no evaluation at all of instances where compressors are not equipped with internal access to the roof.

tion among Vickers and all the defendants, including Chiles and M & I.

If the district court on remand finds that Ingersoll-Rand was a cause of Vickers' injuries, it should apply the rules of pure comparative fault. *See Lewis v. Timco, Inc.,* 716 F.2d 1425 (5th Cir.1983) (en banc).[8] That is, the district court should reduce Vickers' award by the percentage by which the settling co-defendants and Vickers were at fault. *See Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir.1979).

## VI. *Damages for Mental Pain and Suffering*

■ The district court found that Vickers' damages totalled $503,828.21 and awarded a judgment against Chiles for $277,105.52, or fifty-five percent. Vickers complains on appeal that the district court improperly denied compensation for mental pain and suffering.

At trial, Ronald Pryor, a clinical psychologist, testified that Vickers suffered from anxiety, depression, tension, and emotional distress after his accident and that he even had considered suicide. Pryor explained that accident victims often experience such despair but that a recent divorce also could have caused Vickers' feelings. The district court weighed Pryor's testimony and denied recovery, holding that Vickers' "has not met his burden of showing that *all* his psychological problems were directly caused by his accident with Chiles." (emphasis added).

The district court imposed too heavy a burden on Vickers by requiring him to show that the accident caused "all" his mental anguish. To recover, Vickers need show only that the accident was a proximate cause of some of his mental pain and suffering. *See Howell v. Marmpegaso Compania Naviera, S.A.,* 536 F.2d 1032 (5th Cir.1976); *Noble v. Bank Line, Ltd.,* 431 F.2d 520 (5th Cir.1970) (awarding damages for mental pain and suffering). On remand, if Ingersoll-Rand is found liable, the district court should decide whether the Chiles accident caused *any* (not all) of Vickers' mental suffering and, if so, how much money would compensate Vickers for the mental anguish attributable to the knee injury. Ingersoll-Rand will be responsible for its proportional share of all of Vickers' damages, including the mental anguish due to the injury.[9]

In all other respects, we affirm the district court's calculation of total damages.

## VII. *Conclusion*

Ingersoll-Rand provided an obscure but effective internal access to the roof of its compressor. But it failed to post a notice so that a worker could find it. Because outside access to the roof entailed high risks, the compressor was defectively designed and unreasonably dangerous for its foreseeable, normal use. We remand for the district court to reapportion the causation of Vickers' accident in light of our decision. In so doing, the district court should use the rules of comparative fault in

---

8. *Timco* was an admiralty case that applied federal law. As set out above, *federal* law governs the case before us. In their briefs on appeal, however, the parties debate whether *Louisiana* law provides for comparative fault in strict products liability. In *Bell v. Jet Wheel Blast,* 462 So.2d 166 (La.1985), the Louisiana Supreme Court held that a plaintiff's recovery should be reduced by his own negligence when such a reduction would benefit society, that is, when it would encourage consumers to be more careful and would not intolerably reduce manufacturers' incentives to make safe products. *Jet Wheel Blast* is applied on a case-by-case basis, but Louisiana courts widely have adopted comparative fault in strict liability cases. *See Landry v. State,* 495 So.2d 1284 (La.1986); *Jones v. T.G. & Y. Stores Co.,* 775 F.2d 663, 665 (5th Cir.1985).

9. Vickers should recover in this suit for mental anguish caused by his accident but not for mental anguish caused by his divorce. The divorce, if a cause of Vickers' mental anguish, was an independent cause for which Ingersoll-Rand is not responsible. Vickers may suffer mental anguish for various reasons, but Ingersoll-Rand is liable, if at all, only for its proportional share of the anguish caused by the injury. *See* W. Prosser, Law of Torts § 52 (4th ed. 1971); *Black v. Sheraton Corp.,* 564 F.2d 531, 548–49 (D.C.Cir. 1977) (defendant not liable "where the harm results from an outside force, the risk of which is not increased by the defendant's act") (quoting Restatement (Second) of Torts § 435A).

admiralty cases. Finally, the district court should award damages for any mental anguish proximately caused by the injury.

The decision of the district court is REVERSED AND REMANDED.