### Delma J. DAIGLE

v.

### L & L MARINE TRANS. CO.

No. Civ.A. 02–2325.

United States District Court, E.D. Louisiana.

June 14, 2004.

---

John Gilbert Munoz, Garner & Munoz, New Orleans, LA, for Plaintiff.

Jason P. Waguespack, Galloway, Johnson, Tompkins, Burr & Smith, New Orleans, LA, for L&L Marine Transportation, Inc., defendant.

David B. Lawton, Charles Felician Lozes, Cynthia Anne Wegmann, Terriberry, Carroll & Yancey, New Orleans, LA, for Certain Underwriters at Lloyds of London, defendant.

Mark Stephen Taylor, Waller & Associates, Metairie, LA, for Donovan Marine, Inc., Third-Party Defendant/Plaintiff.

A. Remy Fransen, Matt Remy Fransen, Fransen & Hardin, New Orleans, LA, for Midship Marine, Inc., Third–Party Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FALLON, District Judge.

### I. Procedural History

This case arises out of injuries sustained by the Plaintiff on April 10, 2002, when the captain's chair in which he was sitting allegedly collapsed at the time the vessel was moving barges in a grain facility located on the Mississippi at Reserve, Louisiana. At the time of the incident, the Plaintiff was employed by L & L Marine Transportation Company ("L & L") as the captain of the M/V MYRNA ANN. L & L was the owner *pro hac vice* and the operator of the M/V MYRNA ANN.

On July 30, 2002, the Plaintiff filed a complaint in this Court against L & L under the Jones Act, 46 U.S.C.App. § 688, and general maritime law. The Plaintiff later amended his complaint to include an action against the vessel *in rem*. On February 4, 2003, L & L filed a third-party complaint against Seats Incorporated ("Seats"), the manufacturer of the chair seat, and Donovan Marine ("Donovan"), the seller/manufacturer of the chair pedestal. Pursuant to Federal Rule of Civil Procedure 14(c), L & L tendered the third-party Defendants to the Plaintiff. Seats was later dismissed when the parties discovered that the pedestal of the chair allegedly malfunctioned not the seat.

On September 30, 2003, Donovan filed a third-party complaint against Midship Marine ("Midship"), the manufacturer of the pedestal. In the first paragraph of their complaint, Donovan stated that it was taking the position of third-party plaintiff pursuant to Rule 14(c). Donovan cited Rule 14(c) a second time in its prayer for relief, but nowhere specifically stated that it "tendered" Midship to the Plaintiff.

Finally, on October 15, 2003, the Plaintiff filed his third amended complaint, adding a direct action against L & L's insurer, Certain Underwriters at Lloyd, L & L's insurer, pursuant to La. R.S. § 22:655, *et seq.*

The Court commenced a two and one-half day bench trial on Monday, May 3, 2004. After hearing the witnesses and considering all the evidence, the Court issues the following findings of fact and conclusions of law. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent that a conclusion of law constitutes a finding of fact, the Court likewise adopts it as such.

### II. Findings of Fact

1.

At all times pertinent hereto, L & L was the owner *pro hac vice* and operator of the M/V MYRNA ANN. The M/V MYRNA ANN is a sixty (60) foot, twelve hundred (1200) horsepower push boat, which entered service in March, 2002. When the vessel entered service, she and her relevant appurtenances were new. One of her

appurtenances, the captain's chair at issue, was purchased from Donovan.

2.

The Plaintiff was employed in the capacity of boat captain by L & L and assigned to work aboard the M/V MYRNA ANN.

3.

On April 10, 2002, the vessel was shifting barges within Cargill's Reserve Fleet. The Plaintiff was working the day shift with one other crew member, deckhand, David Leblanc. In the early afternoon, the Plaintiff ordered the deckhand to tie up empty barges to take to the Terrehaute Fleet in Myrtle Grove, Louisiana. After the deckhand finished tying off four empty barges to the bow, the Plaintiff got the vessel underway. The Plaintiff remained standing while the vessel worked in the fleet and while getting underway.

4.

After getting the vessel underway, the Plaintiff sat on the forward portion of the captain's chair, with his feet located on the floor of the wheelhouse. A few minutes later, the Plaintiff put his feet on the chair's footrest and pushed himself back in the chair. to get into a more comfortable position. As he pushed himself back, the chair unexpectedly fell over, causing the Plaintiff to fall onto the floor, striking his head, back, and shoulder on the vessel's steel interior door frame and on the floor.

5.

The incident was unwitnessed. However, at the time of the incident, the deckhand was climbing the vessel's interior stairs, just about to enter the wheelhouse, when he heard a loud crash. Upon entering the wheelhouse, the deckhand found the Plaintiff and the chair lying on the floor. After helping the Plaintiff up, the deckhand and the Plaintiff inspected the chair pedestal and found that one of the leveling screw-in footpads had come out of its receptacle. Upon closer inspection, the Plaintiff and deckhand discovered that the last few threads of the receptacle were completely stripped. Further inspection of the other leveling screws indicated that they had also been unscrewed in an apparent attempt to level the chair.

6.

The captain's chair at issue consists of a seat and a base or pedestal. The pedestal is made of aluminum and is star-shaped with five prongs. Each prong of the base had an internally threaded aluminum receptacle into which a stainless steel screw with an attached footpad was inserted.

7.

Donovan paired the Midship pedestal with a chair made by Seats and pictured both as one unit in its products catalogue, described as a "Heavy Duty Pilot Chair with Pedestal." Below the picture of the integrated unit is the following language: "Seats meet or exceed FMVSS and SAE standards and are warranted against defects in material and parts. Made in the USA by Seats, Inc., a manufacturer of Marine, Automotive and Industrial Seats." Nowhere in the product's description is Midship mentioned. The catalogue description indicates that the pedestal and the seat are sold separately, but otherwise makes no mention of the pedestal.

8.

The pedestal at issue was made by Midship. Midship constructs aluminum boats for use in the offshore industry and began making the pedestals for captain's chairs in 1996 at the request of Don Adams. In 1996, Don Adams was employed by Marine Service & Supply. Adams approached Midship about making the pedestals because Adams believed that Midship could manufacture a better quality pedestal with stronger welds. Midship reproduced the pedestal based upon an exemplar pedestal

provided by Adams. Midship only provided the pedestals to Adams and Marine Service & Supply. In 1998, Adams began working for Donovan. Thereafter, Midship stopped providing the pedestals to Marine Service & Supply and only supplied them to Donovan. Since 1996, Midship has constructed approximately three hundred and forty (340) pedestals for use with captain's chairs.

9.

Midship constructed the pedestal from scrap or leftover aluminum in its yard. The footpads were attached to the pedestal by screwing them into the base of each prong. This type of screw-in footpad is commonly recognizable and referred to as a leveling mount or leveling screw. That is, this type of design is typically used on items that may need to be leveled by adjusting the length of the screws upwards and downwards as necessary.

10.

Regarding the pedestals at issue, the aluminum receptacle into which the footpads were secured was created by drilling a hole and then tapping the hole to provide internal threading. The footpad itself was located on the end of a stainless steel screw, which screwed into the threaded receptacle and engaged with the threading. The tapped hole was also tapered, so the diameter decreased in the receptacle in the direction in which the footpads were screwed. Before inserting the footpads, Midship shortened the length of the screw by cutting it. Midship inserted the footpads into the tapered receptacle with a hand wrench as far as possible, so that just a couple of threads were visible at the base of the receptacle.

11.

The process by which the footpads were inserted necessarily caused stripping of the internal threads. This stripping occurred as the harder steel of the screws came into contact with and was forced into the tapered receptacle made of softer aluminum. Though the design employed a leveling mount, it was not constructed to be used as such. However, no warning, instructions, or information was provided by either Midship or Donovan indicating that the leveling mounts should not be unscrewed or adjusted. There was also no indication of how long the screw attached to the footpad was or what the consequence of adjusting the footpad might be.

12.

As stated above, following the incident, the Plaintiff and the deckhand discovered that one of the footpads had come completely disengaged, causing the chair to fall as the Plaintiff attempted to sit in it. The footpad became disengaged because, after the chair was installed on the vessel, some crew member aboard the vessel, other than the Plaintiff, adjusted the footpad.[1] When the footpad was unscrewed, more stripping occurred and the footpad became unstable in the receptacle and eventually failed.

13.

As a result of the incident, the Plaintiff suffered an abrasion on the back of his head and experienced immediate pain in his right shoulder, neck, and low back. He did not think that he was seriously injured nor that he required immediate medical attention. The Plaintiff noted the accident in the vessel's logbook, but did not com-

1. The evidence reveals that from the time the vessel was placed in service until the incident giving rise to this lawsuit three captains, including the Plaintiff, and at least as many deckhands worked aboard the vessel. It is reasonable to conclude that the footpads were adjusted by one or more of them since there was no need to adjust them before the chair was placed aboard the vessel.

plete an accident report as none were available on the vessel. His entry in the logbook on April 10, 2002, at 1340 states: "foot of wheelhouse chair came off fell backwards and hit head and back on wheelhouse door."

14.

The Plaintiff continued to work for L & L for approximately one month. He eventually resigned because L & L was having trouble meeting its payroll. After leaving L & L, the Plaintiff attempted to work for several other companies. However, the pain in his neck and shoulder continued to increase until it became impossible for him to work. Throughout this period, he received conservative treatment consisting of pain medication and an occasional injection from Dr. Norman Ott and his family physician, Dr. Ahman Haidar. The pain, however, persisted and began to radiate into the right arm and hand. Nerve conduction studies were performed, and Dr. Haidar referred the Plaintiff to Dr. Stefan Pribil, a neuro-surgeon.

15.

Dr. Pribil first saw the Plaintiff on August 20, 2002. At that time, the Plaintiff's complaints were neck pain, right shoulder pain, bilateral hand numbness, bilateral feet numbness, low back pain, and general aches in his low back area. Dr. Pribil reviewed the cervical and thoracic MRI studies and concluded that there was some disc herniation at the C4–5 level and suggestive mild herniation at C5–6 and some at C3–4. According to Dr. Pribil, subsequent EMG studies confirmed abnormalities in the cervical region, particularly in the C3–6 area and a small herniation in the lumbar region at L4–5. After a period of conservative treatment, Dr. Pribil performed an anterior cervical discectomy and fusion from C–4 to C–6 and installed a cage and plate to insure stability. During the surgical procedure, Dr. Pribil noted," a very large compression was existent on the right at the C4–5 level and the C5–6 level."

16.

Immediately following surgery, the Plaintiff's neck pain lessened. However, over time it returned and worsened. Dr. Pribil is of the opinion that the Plaintiff requires another surgical procedure which would incorporate C3 and C7 into the fusion, so that the Plaintiff's cervical spine would be fused from C3 to C7. According to Dr. Pribil, the Plaintiff is presently in pain and disabled from employment.

17.

The Plaintiff was also examined by Dr. J. Monroe Laborde. Dr. Laborde saw Daigle on two occasions, first on January 29, 2003, and next on August 15, 2003. Dr. Laborde's views are inconsistent with those of Drs. Ott, Haidar, and Pribil. Dr. Laborde opined that the Plaintiff's symptoms are due either to the normal aging process or to psychological factors. He testified that the Plaintiff presently has a five (5) to ten (10) per cent impairment of the body and "may return to any type of work he is willing to do." Dr. Laborde's views are inconsistent with the facts, the Plaintiff's past work history, and the overwhelming testimony of the Plaintiff's treating physicians.

18.

At the time of the incident, the Plaintiff was thirty-three (33) years old. He has a sixth grade education and has been working since he was fourteen (14) years old. He resides with his wife, who is dependent upon him economically. The Plaintiff was successful and possessed abilities in the maritime field that do not readily transfer to other occupations. The Plaintiff will not be able to return to the maritime field as an active boat captain, but should be able, in time, to return to some gainful occupation.

## III. Conclusions of Law

### 1.

This Court has original jurisdiction over this matter pursuant to the Jones Act, 46 U.S.C.App. §§ 688, et seq., and the Court's admiralty jurisdiction, 28 U.S.C. § 1333. The substantive law applicable to this case is prescribed by the Jones Act and general maritime law of the United States.

### A. Jones Act

#### 2.

■ Under the Jones Act, a seaman has a cause of action against his employer for negligence. *Becker v. Tidewater*, 335 F.3d 376, 386 (5th Cir.2003). The fundamental duty of a Jones Act employer is to provide his seaman employees with a reasonably safe place to work. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir.1989); *see* Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 6–21 (4th ed.2004). A Jones Act employer's duty to provide a reasonably safe place to work is "absolute and non-delegable." Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 6–21, at 341. This duty applies whether the employer is the owner of the vessel, or, as in the case at bar, the owner *pro hac vice*. *See id.* A cause of action under the Jones Act arises when this duty is breached.

#### 3.

■ While the Jones Act employer's duty to provide a reasonably safe place to work is broad in scope, it is not a form of strict liability. *See Colburn*, 883 F.2d at 374; *Perry v. Morgan Guar. Trust Co. of N. Y., et al.* 528 F.2d 1378, 1379 (5th Cir.1976). Fault is required. However, the employer must have actual or constructive notice of the unsafe condition and an opportunity to correct it before liability attaches. *Colburn*, 883 F.2d at 374; *Perry*, 528 F.2d at 1379. A Jones Act employer is liable for the negligence of any of its employees. *See Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 303 (5th Cir.1984) (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 222 (5th Cir.1975), *overruled on other grounds by Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331 (5th Cir.1997)).

#### 4.

■ A leveling mount was used to attach the footpad to the pedestal. However, the leveling screw was lodged into the receptacle in such a way that it could not be safely used as a leveling device. Some member of the crew other than the Plaintiff, adjusted the leveling screw.

The adjustment had to be done with a wrench or similar tool while the chair was upturned. Some force had to be exerted to "break" the fused screw loose from its tappered receptacle. The person doing this could have loosened the screw all the way to determine how long it was so as not to leave the screw hanging by only one or two threads, as was the case here. Failure to do this once the process of adjustment was undertaken created or allowed the creation of the hazardous condition which existed in this case. Thus, L & L, through its employees, had notice, either actual or constructive, of the unsafe condition and had an opportunity to correct the unsafe condition. L & L failed to do so and, as such, is liable under the Jones Act.

#### 5.

■ In its answer, L & L claimed that it was entitled to the benefits of the Ship Owner's Limitation of Liability Act, 46 U.S.C.App. §§ 183–188, as the owner *pro hac vice* of the M/V MYRNA ANN. A ship owner is entitled to limit its liability to the amount of the vessel only if it shows that the negligence or unseaworthy condition causing the injury occurred without its privity and knowledge. *Farrell Lines,*

*Inc. v. Jones,* 530 F.2d 7, 10 (5ᵗʰ Cir.1976). Here, L & L has failed to carry its burden of proving lack of privity and knowledge. Thus, it is not entitled to limitation.

## B. Unseaworthiness

### 6.

■ Independent of its duty under the Jones Act, a shipowner or operator of a vessel owes a duty to furnish a seaworthy ship to members of the vessel's crew. *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The duty of seaworthiness is absolute, but "it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use." *Id.* at 550, 80 S.Ct. 926. That is, the duty is reasonableness, not perfection. For a vessel to be found unseaworthy, the seaman must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. *Jackson v. OMI Corp.,* 245 F.3d 525, 527 (5ᵗʰ Cir. 2001). The standard required to prove causation for unseaworthiness is more strict than for a Jones Act claim of negligence. *Comeaux v. T.L. James & Co., Inc.,* 702 F.2d 1023, 1025 (5ᵗʰ Cir.1983). Causation in unseaworthiness requires a showing of "proximate causation in the traditional sense." *Id.* Under this standard, the Plaintiff must show that the captain's chair was not fit for its intended use and that this condition was a direct and substantial cause of his injuries. *See Alverez v. J. Ray McDermott & Co., Inc.,* 674 F.2d 1037, 1043 (5ᵗʰ Cir.1982).

### 7.

■ In this case, the Plaintiff has established a claim of unseaworthiness. When put to its normal and intended use, the captain's chair collapsed, causing the Plaintiff to fall to the floor and suffer injuries. The unseaworthy condition, however, was due to the defective condition of the chair pedestal. As such, L & L is entitled to indemnity from the seller and manufacturer of the defective product. *See Marathon Pipe Line Co. v. Drilling Rig ROWAN/ODESSA,* 761 F.2d 229, 236 (5ᵗʰ Cir.1985).

## C. Products Liability

### 8.

■ L & L sued Donovan for indemnity and also tendered Donovan to the Plaintiff pursuant to Federal Rule of Civil Procedure 14(c). Donovan then sued Midship for indemnity and intended to tender Midship to the Plaintiff. At trial, Midship argued that they have not been properly tendered and would only be liable to Donovan in the event that the Court found Donovan to be liable. The Court ruled on this matter orally at the trial of the case, finding that Donovan had properly tendered Midship to the Plaintiff because Donovan cited Rule 14(c) twice in their third-party complaint, which is sufficient under the liberal interpretation given to Rule 14(c) by the courts. *See e.g., Royal Ins. Co. v. Southwest Marine,* 194 F.3d 1009 (9ᵗʰ Cir.1999). Accordingly, Donovan and Midship are liable directly to the Plaintiff under the general maritime law's application of strict products liability.

The parties do not dispute that the doctrine of strict products liability is part of the general maritime law. *See Vickers v. Chiles Drilling Co., et al.,* 822 F.2d 535, 538 (5ᵗʰ Cir.1987); *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). There is also no dispute that Section 402A of the Restatement (Second) of Torts (1965) applies in maritime products liability cases and is therefore applicable here. *See Id.*

#### 9.

Under the Restatement, a seller as well as a manufacturer may be held liable for harm caused by a defective product placed in the stream of commerce. Section 402A of the Restatement (Second) of Torts (1965) provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

 (a) the seller is engaged in the business of selling such a product, and

 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

 (a) the seller has exercised all possible care in the preparation and sale of his product, and

 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Thus, § 402A requires the Plaintiff to prove: (1) that the defendant sold or manufactured the product; (2) that the product was unreasonably dangerous or was in a defective condition when it left the defendant's control; and (3) that the defect resulted in the injury to the plaintiff. Restatement (Second) of Torts § 402(A)(g) (1965); Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 5–6, at 206.

According to comment (g) of § 402A, the rule applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to the ultimate consumer. "The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed." Restatement (Second) of Torts § 402(A)(g) (1965).

The burden of proof that the product was in a defective condition at the time it left the hands of a particular seller is upon the plaintiff. According to comment (g), "unless evidence can be produced which will support the conclusion that it was then defective, then the burden is not sustained." A product is not in a defective condition when it is safe for normal handling and consumption. Restatement (Second) of Torts § 402(A)(g) (2003).

Comment (i) to § 402A provides a definition of "unreasonably dangerous." According to the comment, "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, which the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402(A)(i) (2003).

The *Vickers* Court applied § 402A, including the comments, and explained that, in admiralty cases, the "normal" use of a product includes all reasonably foreseeable uses, including foreseeable misuse. *Vickers,* 822 F.2d at 538. In such cases, to prevent a product from being unreasonably dangerous,"a seller may be required to give directions or instructions for use." *Id;* Restatement (Second) of Torts § 402(A)(j) (1965). Liability is imposed upon sellers or manufacturers who fail to warn of a defective condition if the defect was known and the manufacturer or seller, by exercising reasonable diligence, could have made such warnings available to the user. *See Vickers v. Chiles Drilling Co., et al.,* 822 F.2d 535, 538–39 (5th Cir.1987).

#### 10.

In the case at bar, the captain's chair collapsed when one of the footpads

became disengaged from the pedestal. Though the design of the pedestal employed a leveling mount, it was not constructed to be used as such precisely because adjusting the leveling screw would necessarily strip the internal threads further, thereby creating a hazardous condition. Leveling screws are included on equipment for the express purpose of enabling users to adjust the way equipment sits on specific surfaces. Thus, a user would not have known or expected that it would be unsafe to adjust the leveling screws at issue. Accordingly, the Court finds that the pedestal at issue was in a defective condition and was unreasonably dangerous to the Plaintiff because it lacked instructions and a warning indicating that the leveling screws could not be safely adjusted. The Court further finds that the lack of instructions or warning caused the Plaintiff's injury because, as the testimony established, the footpad could not have come dislodged unless someone adjusted the leveling mount.

Donovan exhibited the assembled seat and pedestal in its catalog. It had the opportunity as well as the duty to advise purchasers of any potential hazard. It also selected the design and knew or should have known of any potential hazard. Donovan marketed and sold the integrated seat and pedestal unit to L & L. As the seller, Donovan placed the defective product into the stream of commerce. Donovan's catalogue makes no mention of Midship or the fact that the pedestals were separately manufactured. As such, even though Donovan did not affix anything to the pedestal indicating that it was a Donovan product, Donovan held the pedestal out as its own.

### 11.

 Donovan seeks to escape liability by arguing that Midship manufactured the pedestals and that Donovan was merely a middle-man seller. However, Midship manufactured the pedestals exclusively for Donovan according to its specifications at the request of a Donovan employee, Don Adams. Donovan made the decision to pair the pedestals with the seats and market a complete captain's chair to consumers. In this way, Donovan is both a seller and a manufacturer. As such, the Court finds that Donovan had the duty to warn users of the dangers involved in adjusting the leveling mounts on the pedestal. "It is a fundamental principle of the law of product liability in this Circuit that a manufacturer has a responsibility to instruct consumers as to the safe use of its product and to warn consumers of dangers associated with its product of which the seller either knows or should know at the time the product is sold." *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984); *see* Restatement (Second) of Torts § 402(A)(j) (2003). A seller particularly bears this responsibility for dangers that are not generally known. Restatement (Second) of Torts § 402(A)(i) (2003). In this case, the subject chair had leveling screws which were constructed in such a way that they could not be safely used without great caution. Thus, Donovan is liable under § 402A.

### 12.

The more difficult question before the Court is whether or to what extent Midship should share liability with Donovan. Midship argues that they are not liable because they merely reproduced the template provided to them by Don Adams. According to Midship, they followed directions and simply manufactured a component part. Under Restatement (Second) of Torts § 5, a "component seller should not be liable when the component itself is not defective." However, the

Court has found that the component, namely the pedestal, was defective.

Michael Hinojosa, President of Midship, testified at trial to the way in which the pedestals were constructed, particularly the receptacle into which the footpads were fitted. As explained above, Midship lodged a stainless steel screw-in footpad into a tapered, aluminum receptacle. Hinojosa further testified that use of this design did not contemplate that the leveling mounts would be adjusted. The Court finds that Hinojosa reached this conclusion because he knew that adjusting the mounts would result in further stripping of the internal threads. Thus, even though Midship merely fabricated the pedestals based on a design provided to them by Don Adams, Midship either knew or should have known that the use of a leveling screw in such a design could create a hazardous condition. Regardless of whether Midship knew of the final use of the pedestal, that it would be paired with a seat and sold as a captain's chair, Midship knew that using the leveling screws in their commonly understood manner would damage the receptacles and potentially result in injury. Midship had knowledge and expertise regarding construction and the properties of metals. Midship cannot undertake to fabricate a piece of equipment based on a template and close their eyes to the potential flaws in the design.

13.

The maritime principle of comparative fault is applicable in maritime strict products liability cases. *Lewis v. Timco, Inc.,* 716 F.2d 1425, 1433 (5th Cir.1983). As the Fifth Circuit stated, "general considerations of fairness and efficiency support a comparative fault defense in products liability actions. In maritime suits, these considerations are bolstered by the historical reliance on comparative fault as integral to an essentially uniform and unitary body of law." *Id.*

■■■ In this case, the Court finds that Donovan bears the majority of the liability for failing to provide a warning to users. Donovan entered into a special arrangement with Midship to have the pedestals constructed especially for them to pair with a seat that would then be marketed and sold as a complete captain's chair. The fact that Donovan may not have connected the seat and the pedestal is irrelevant. Donovan knew the use to which the end users put the pedestals, and it was Donovan's responsibility to instruct users of potential hazards.

Donovan, however, does not bear total fault in this case. Donovan approached Midship because of Midship's expertise in building boats. Though Donovan only asked Midship to improve the strength of the welds, Midship had knowledge concerning metals and construction that Donovan did not have. The law cannot countenance a sophisticated manufacturer escaping liability simply because they argue that they just followed instructions. Midship must bear some liability.

## D. Maintenance and Cure

14.

■■■ In addition to a claim for unseaworthiness, a seaman is also entitled to receive maintenance and cure from his employer if he becomes ill or injured during his service to the ship. *Boudreaux v. United States,* 280 F.3d 461, 468 (5th Cir. 2002). A shipowner must pay maintenance and cure to any seaman who becomes ill or injured during his service to the ship, regardless of whether the shipowner was negligent. *Bertram v. Freeport McMoran, Inc.,* 35 F.3d 1008, 1011 (5th Cir.1994). Thus, to establish a claim for maintenance and cure, a seaman need only show that

his injuries occurred while in service to the vessel. *Boudreaux,* 280 F.3d at 468.

 The doctrine of maintenance entitles an injured seaman to the reasonable cost of food and lodging actually expended. *Hall v. Noble Drilling Inc.,* 242 F.3d 582, 587–88 (5th Cir.2001). The concomitant doctrine of cure obligates the shipowner or operator to reimburse medical expenses actually incurred and to ensure that the seaman receives the proper treatment and care. *Boudreaux,* 280 F.3d at 468. The maintenance and cure obligation ceases only when the seaman has reached maximum cure. *Id.* Maximum cure is reached when it is probable that further treatment will result in no betterment of the seaman's condition. *Springborn v. Am. Commercial Barge Lines, Inc.,* 767 F.2d 89, 95 (5th Cir.1985).

15.

 In this case, the Plaintiff has established that he was injured in the course and scope of his duty as captain of the ship. L & L has paid maintenance in the amount of $1500 per month from September 2003 until the present. The Plaintiff testified that this is an appropriate estimate of his actual expenditures for food and lodging. Accordingly, the Court finds that the Plaintiff is entitled to receive maintenance from his employer, L & L, at the rate of $1500 per month from the date of his injury until September, 2003. He is also entitled to cure in the amount of the past medical expenses incurred as a result of his injury.

At the time of trial, the Plaintiff had not reached maximum cure. However, it is uncertain when he will do so or whether he will, in fact, seek future treatment. Thus, the Court will not award future maintenance or cure. This will have to be pursued by the Plaintiff at some future time if it becomes an issue.

16.

 L & L correctly notes that a shipowner may recover maintenance and cure payments from a third-party whose negligence partially or wholly caused the seaman's injury. *Bertram,* 35 F.3d at 1013; *Savoie v. Lafourche Boat Rentals, Inc.,* 627 F.2d 722, 723 (5th Cir.1980) (citing *Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co.,* 410 F.2d 178, 186 (5th Cir. 1969)); Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 6–35, at 397. Thus, L & L is entitled to recover from Donovan and Midship to the extent (percentage) of their respective fault.

## IV. Damages

17.

At the time of the incident, the Plaintiff was thirty-three (33) years old. His work-life expectancy from the date of trial is twenty-three (23) years. He began his career in the maritime industry when he was twenty (20) and received his captain's license when he was twenty-two (22). He has been working as a captain ever since that time.

18.

Under the Jones Act and general maritime law, monetary recovery is allowed for loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 5–15, at 234. The Court notes that a cure award cannot duplicate tort damages. *Boudreaux,* 280 F.3d at 469.

19.

Regarding loss of wages, before computing the Plaintiff's loss of earning capacity, the Court must determine his annual wage earning capacity. *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 533–34, 103

S.Ct. 2541, 76 L.Ed.2d 768 (1983); *See e.g., Gates v. Northwest Ins. Co.*, 881 F.2d 215, 218 (5th Cir.1989) (citing *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983)). Marine work is not as predictable as shore side work. It is often affected by weather and the vagaries of the trade. But past history supplies some guidance in determining the Plaintiff's ability and worth in the industry.

## A. Past Wage Loss

### 20.

On the date of his injury, April 10, 2002, the Plaintiff was employed by L & L as captain of the M/V MYRNA ANN. He earned $225 per day, working fourteen (14) days on and seven (7) days off. In the years, 2001, 2000, and 1999, the Plaintiff worked for Bisso Marine and earned the respective amounts per year: $30,927.78 $62,661.13; $79,203.86.

■ Annualizing the Plaintiff's earnings at the time of his injury computes to $54,675. Averaging his wages for the three (3) years prior to his injury results in an average annual wage of $57,597. Thus, the Court finds that it is appropriate to use $55,000 *per annum*, or $4583.33 per month, as a fair estimate of his wage earning capacity.

The evidence indicates that the Plaintiff continued to work for L & L until May 20, 2002 and earned approximately $2560. Thereafter, it appears from the evidence that he also worked for American Tugs/Gulf South Marine and others. He was offered a job by his former employer, Bisso, for $315 per day, but had to decline the offer because of increasing pain. Subtracting the amounts earned after his injury results in past loss of wages to the date of trial of approximately $90,000.

## B. Future Wage Loss

### 21.

■ The Plaintiff has a sixth-grade education, but through industry and ability succeeded in getting a master's license and working as a push-boat or tug boat captain for several years. His job has a significant physical component to it. He is required to walk on uneven surfaces, steady or brace himself in rolling or pitching conditions, climb, bend, stoop, and jump. Because of his injuries and permanent residual disability, it is reasonable to conclude that the Plaintiff will not be able to return to his job as captain of a push-boat or tug.

However, he should be able to return to some work. His work history indicates that he is reliable, has leadership skills, and is industrious. He is hampered by lack of formal education, but he should be able to earn more than minimum wage. However, he will require convalescence and considerable retraining. Keeping all this in mind, the Court concludes that, after taxes and a reduction for present value (*See Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490, 498, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *Jones & Laughlin Steel Corp.*, 462 U.S. at 536–37, 103 S.Ct. 2541), the Plaintiff will have a future wage loss of $450,000. This assumes a total loss of wages for five (5) years and a loss of approximately $20,000 for the next ten (10) years reduced to present value by a discount factor of one (1) per cent.

## B. Maintenance and Cure

### 22.

■ L & L began maintenance payments in the amount of $1500.00 per month in September, 2003. However, the Plaintiff was entitled to receive maintenance payments beginning May, 2002. Thus, L & L owes the Plaintiff monthly maintenance payments from May, 2002

through September, 2003, or a total of $25,500.

A cure award cannot duplicate tort damages. In this case, the Plaintiff has incurred past medical expenses totaling $101,478.85 for injuries sustained due to the incident. The Court finds that the Plaintiff is entitled to receive this amount as past cure. As stated above, the Plaintiff will have to pursue future maintenance and cure should any become due in a subsequent action.

## D. Pain and Suffering

23.

■ A seaman who is injured due to a vessel's unseaworthiness is also entitled to recover damages for pain and suffering. *Sosa v. M/V LAGO IZABAL,* 736 F.2d 1028, 1034 (5th Cir.1984). In this case, the Plaintiff has suffered physical pain associated with his injury, surgery, and recovery. He continues to experience pain and may require a second surgery. The Plaintiff testified that he has trouble sleeping and has suffered from depression. Due to his injuries, the Plaintiff can no longer engage in the activities and hobbies he used to enjoy; his familial relationships have been negatively affected; and he will likely not be able to return to the kind of work that he found satisfying. For all these reasons, the Court finds that the Plaintiff is entitled to an award of $300,000 for pain and suffering.

## E. Pre-judgment Interest

24.

■ In admiralty, the court has the discretion to award pre-judgment interest. In this Circuit, there is a strong presumption in favor of awarding pre-judgment interest, and it will usually only be denied in cases where the plaintiff exercised undue delay in bringing his action. *U.S. v. Ocean Bulk Ships, Inc.,* 248 F.3d 331, 344

(5th Cir.2001). The Court finds no such delay present in the case at bar and finds that the Plaintiff is entitled to receive pre-judgment interest in the amount of 1.92%. This figure represents the judicial interest rate at the time of judgment.

■ However, in this Circuit, pre-judgment interest may only be awarded on damages that have actually accrued as of the date of judgment. *Martin v. Walk, Haydel & Assocs., Inc.,* 794 F.2d 209, 212 (5th Cir.1986). Accordingly, the Plaintiff may only receive pre-judgment interest on past damages, not future damages.

## F. Apportionment of Liability

25.

■ Under the Jones Act and general maritime law, the Defendants are liable jointly and severally to the Plaintiff. *Hardy v. Gulf Oil Corp.,* 949 F.2d 826, 829 (5th Cir.1992). However, in maritime tort cases where more than one party is responsible, courts apportion liability on the basis of fault according to the rules of comparative negligence. *U.S. v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1130 (5th Cir.1995). In this case, the Court finds that the Defendants are liable for the following percentages of fault: L & L and its insurer, Certain Underwriters at Lloyd, forty (40) per cent; Donovan fifty-five (55) per cent; and Midship five (5) per cent.

## V. Summary

On the basis of the foregoing Findings of Fact and Conclusions of Law, the Court finds that the Plaintiff has sustained damages due to the joint and concurrent negligence of L & L, Donovan, and Midship and the unseaworthiness of the vessel. Accordingly the Plaintiff is entitled to re-

covery from the Defendants the following damages:

(1) Past wage loss: $90,000;

(2) Future wage loss: $450,000;

(3) Past maintenance: $25,500;

(4) Past cure: $101,478.85;

(5) Past pain and suffering: $200,000;

(6) Future pain and suffering: $100,000; totaling, $966,978.85.

The damages are to be proportioned among the Defendants so that L & L and its insurer, Certain Underwriters at Lloyd, pay forty (40) per cent; Donovan pays fifty-five (55) per cent; and Midship pays five (5) per cent.

Additionally, the Plaintiff is entitled to prejudgment interest on the above-mentioned past losses totaling $416,978.85, at the rate of 1.92% per annum from the date of judicial demand until satisfied. Further, the Plaintiff is entitled to post-judgment interest at the legal rate from the date of judgment until paid on the future wage loss and pain and suffering totaling $550,000.

IT IS SO ORDERED.